UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WYANDOTTE PROFESSIONAL
BUILDING, LLC,

                Plaintiff,                No. 12-10740

vs.                                            Hon. Gerald E. Rosen

KEYBANK, N.A.,

                Defendant.
_____/

OPINION AND ORDER REGARDING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on September 30, 2013

PRESENT:   Honorable Gerald E. Rosen
                         United States District Chief Judge

I. INTRODUCTION

This diversity defamation/negligence action is presently before the Court on Defendant KeyBank, N.A.'s Motion for Summary Judgment. Plaintiff has responded and Defendant has replied. Having reviewed and considered the parties' briefs and supporting exhibits, the Court has determined that the pertinent allegations and legal arguments are sufficiently addressed in these materials and that oral argument would not assist in the resolution of this motion. Accordingly, the Court will decide Defendant's motion "on the briefs." See L.R. 7.1(f)(2). This Opinion and Order sets forth the Court's

1

ruling.

## II.  FACTUAL BACKGROUND

Plaintiff Wyandotte Professional Building, L.L.C. ("Wyandotte"), is a limited liability company created by Kalil ("Kal") Khalil in 2006 for the purpose of purchasing a professional building located at 1628 Ford Avenue in Wyandotte, Michigan. Khalil operates an income tax and accounting business.[1] In order to purchase the building, Kal Khalil negotiated and obtained a loan from KeyBank in the amount of $332,000.00. At the time, there were three members of the LLC -- an attorney, Mohammed Abdrabboh, and two podiatrists, Nsima Usen and Mohammed Khalil, Kal Khalil's brother -- and all three individuals located their professional practices in the building.

The $332,000.00 loan obtained by the LLC was secured by a mortgage on the property. Abdrabboh and Usen also personally guaranteed the loan.[2] Abdrabboh and his company, Mo Abdrabboh Investments, also received a $50,000 line of credit from KeyBank which was also secured by the mortgage on the property.

Wyandotte failed to make its monthly loan payment for February 2009. At the same time, Abdrabboh defaulted on his personal line of credit with KeyBank. On April

---

[1] Although referred to by Defendant's representatives as Wyandotte's CPA, Kal Khalil is not a CPA. He testified that he passed two of the four parts of the CPA exam, but decided not to take the last two parts. Instead, he got a Masters' degree in tax and went to law school. He testified that he graduated from law school but never took the bar exam.

[2] Mohammed Khalil, the third member of the LLC, did not personally guarantee the loan.

15, 2009, KeyBank sued Wyandotte, Usen, Abdrabboh and Mo Abdrabboh Investments due to these defaults. Abdrabboh eventually paid KeyBank $10,000 to resolve his default on his line of credit. Abdrabboh then decided to move to Dubai and he transferred his 1/3 interest in Wyandotte to Mohammed Khalil. KeyBank subsequently reinstated the loan with Wyandotte but placed it on "non-accrual" status, meaning that it needed to be closely watched. Wyandotte thereafter made its regular monthly payments to KeyBank.

In 2010, Kal Khalil contacted KeyBank and represented to Misty Baker, KeyBank's Vice President in the bank's Asset Recovery Group, that Abdrabboh had left the country and that Usen would soon be leaving, as well.[3] Kal also told Baker that, as a consequence, Wyandotte might default on the loan. At the same time, Kal told Baker that he had a potential buyer for the loan. The buyer was Snow Investments, L.L.C., a company specifically created by Kal Khalil for the express purpose of buying the loan. Snow was owned by Zahiya Hassem, Kal's sister. However, Hassem testified that Kal Khalil runs Snow. According to Hassem, Kal told her that if Snow bought the Wyandotte loan, Snow could recoup its money in a few months plus earn a profit of $40,000 to $50,000.

Based on the information provided by Kal Khalil and the history of the loan and Abdrabboh's related line of credit default, after obtaining a broker's price opinion on the

---

[3] Usen testified, however, that he never had any intent to move out of the United States [Usen 8/14/12 Dep., Defendant's Ex. B, p. 38], and he continues to reside in Southeast Michigan.

property, Baker recommended that KeyBank sell the Wyandotte loan to Snow Investments for $180,000.00 and charge off the remaining $91,622.00 principal balance of the loan. The bank acted in accordance with Baker's recommendation.

KeyBank and Snow closed on the sale of the loan on January 7, 2011. Kal Khalil negotiated and presented the documents to Hassem for signature. Hassem did not review them before signing because "I don't review anything if Kal gives it to me." [Hassem Dep., Defendant's Ex. J, p. 17.]

On a monthly basis, KeyBank's internal accounting system automatically sends data relating to commercial loans to Equifax. Through this automatic reporting system, Equifax was notified that KeyBank had taken a "charge off" on its loan to Wyandotte.

Meanwhile, at the behest of Kal Khalil, on January 31, 2011, Snow offered Wyandotte a 25% prepayment discount, valid for 120 days, or until May 31, 2011. Kal Khalil thereafter contacted Charter One Bank to provide Wyandotte financing to pay off Snow, and had substantial negotiations with Charter One on behalf of Wyandotte.

In connection with Kal Khalil's solicitation of financing on behalf of Wyandotte, Charter One pulled the Equifax report regarding Wyandotte which showed that KeyBank had taken a charge-off relating to the Wyandotte loan. Because neither the KeyBank-Snow "Loan Sale Agreement" (Defendant's Ex. K), nor the Assignment of Loan and Liens document (Plaintiff's Ex. 2) stated that Key had discounted the loan, Charter One sought an explanation from Kal Khalil about the matter. [*See* Defendant's Ex. Q. pp 7-10.] Charter One explained to Khalil that its underwriter was concerned because the loan

was "sold at a discount and someone is taking a loss on it," *id.*, p. 10, and, therefore, needed an explanation of the transactions. Khalil, however, never directly answered Charter One's question. He just kept insisting that Wyandotte was current on its monthly payments and that Snow's purchase of the Wyandotte loan was unrelated to Wyandotte's loan history with KeyBank. He told Charter One that the Snow-Wyandotte deal was just a way for Snow to "mak[e] a little money...it's a quick profit for them," *id.* at p. 13, "a quick profit for the difference between what they paid Key and what they are getting from Wyandotte." *Id.* at p. 7. However, the Snow-Wyandotte agreement was not reduced to writing. *Id.*

Although Kal Khalil does not dispute that KeyBank sold the loan to Snow at less than full value and, thus, "took a hit on the [Wyandotte] loan," [*see* Kal Khalil Dep., pp. 80-81, 92], rather than ask KeyBank to explain to Charter One why it decided to discount the Wyandotte loan when it was sold to Snow, Kal Khalil contacted Misty Baker on April 8, 2011 and requested that the charge-off be removed from Wyandotte's Equifax credit report.

In response to Khalil's request, Baker asked KeyBank Assistant Vice-President Michael Stevens, who was KeyBank's liason with Equifax, to correct the reporting to Equifax and explained to him that "Wyandotte Professional is a loan the Bank chose to sell, and as such took a charge off. The charge off was not taken because the Borrower wasn't paying as agreed." [*See* Defendant's Ex. S.] On April 11, 2011, Baker informed

Kal Khalil that she had asked that the report to Equifax be corrected and told him that it was her understanding that that it usually takes 48 hours to do so. [*See* Defendant's Ex. R.]

On April 21, 2011, Michael Stevens submitted a "Manual Correction Form" to Equifax which stated that KeyBank's loan to Wyandotte "was sold for less than full value at KeyBank's discretion" but that "[t]he sale was not due to default or delinquency on the client's part." [*See* Defendant's Ex. T.] The form also noted that "[a]ll evidence of a charge-off should be removed from the file." *Id.* Although Plaintiff does not dispute that the form was transmitted to Equifax, the reference to the "charge-off" apparently was not removed from Wyandotte's credit report.[4] Although Kal Khalil testified that he contacted Equifax to dispute the information reported on the credit report, he could not remember whether he did so in a letter, a form or an online communication, nor could he remember when he did so. *See* Kal Khalil Dep., pp. 109-110. In any event, he admitted when he did not get any response from Equifax, he never followed up on his letter. *Id.* at 110.

In the meantime, on April 13, 2011, Charter One notified Wyandotte that its loan request was denied. The notice stated that the loan was denied due to "Adverse Business Credit Information -- Chargeoff, Judgement [sic], Foreclosure, Repossession and/or Public Record." [*See* Defendant's Ex. U; Plaintiff's Ex. 9.]

---

[4] Neither party has provided the Court with a copy of Wyandotte's Equifax report.

After KeyBank submitted its correction form to Equifax, Khalil sought reconsideration of Charter One's decision. In reconsidering Wyandotte's loan application, Charter One requested documentation of the Wyandotte-Key and Wyandotte-Snow loan agreements. Defendant's Ex. Q at p. 10. Kal Khalil, however, informed Barbara Danbury that no such written agreements existed; consequently, he was unable to provide the documentation requested. *Id.* at 10-11. Therefore, after further review, on July 22, 2011 Charter One again denied Wyandotte's request stating as the reason for its second denial "Adverse Business Credit Information -- Application has Missing Information." [Plaintiff's Ex. 10.]

Wyandotte thereafter attempted to obtain financing to take advantage of Snow's prepayment discount offer from JPMorgan Chase Bank. Chase, however, denied Wyandotte's application due to "Unsatisfactory business trade lines" and "Delinquent past or present credit obligations with others." [*See* Plaintiff's Ex. 11; Kal Khalil Dep., pp. 113; 119;125-26; 132.]

In the meantime, on May 31, 2011, Snow's offer of a 25% prepayment discount expired by its own terms. Zahiya Hassem testified that the 120-day time limit for keeping the offer open was just an arbitrary choice -- "I could have made it six months, I could have made it two weeks." [Hassem Dep., Defendant's Ex. J, p. 21.] Kal Khalil, in fact, requested a two-month extension of the 120-day deadline, and Hassem granted that request. *Id.* at 22. Khalil, however, did not thereafter ask for any further extension. *Id.*

7

at 24.

In January 2012, Wyandotte finally obtained a loan from Michigan Commerce Bank. Kal Khalil Dep. at 113-117; 132. Wyandotte used the proceeds from the loan to pay off Snow.

Claiming that it was denied the opportunity to timely secure more advantageous financing from Charter One or Chase Bank due to KeyBank's allegedly negligent and defamatory reporting to Equifax of its discounted sale of the Wyandotte loan as a "charge-off," on January 23, 2012, Wyandotte filed this lawsuit in Wayne County Circuit Court seeking to hold KeyBank liable for damages[5] under various theories of negligence (Counts I, IV and VI), defamation (Counts II and V) and violation of the Michigan Consumer Protection Act (Count III). The case was removed to this Court on diversity of citizenship grounds. Discovery has closed and KeyBank now moves for summary judgment.

### III. DISCUSSION

A. APPLICABLE STANDARDS

---

[5] In its Response Brief, Wyandotte has specified its damages as being: $67,052.86 for the 25% discount lost due to having been unable to secure financing from Charter One Bank within 120 days of Snow's prepayment offer; an alleged $2,931.19 increase in interest it will required to pay to Michigan Commerce Bank over the next three years as a result of not being able to obtain financing from Chase Bank (which was purportedly offering at the time a more favorable interest rate than Michigan Commerce Bank), plus approximately $4,000 in closing costs, fees and expenses it claims it necessarily will incur in three years as a result of having to obtain balloon financing from Michigan Commerce Bank (instead of the straight 15-year fixed rate financing that it would have been able to obtain had its application been approved by Chase).

8

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). The Court will apply the foregoing standards in deciding Defendant's motion for summary judgment in this cae.

B.   PLAINTIFF'S CLAIMS OF VIOLATION OF THE MICHIGAN CONSUMER

PROTECTION ACT AND FOR BREACH OF GOOD FAITH FAIL AS A MATTER OF LAW

As an initial matter, two of Plaintiff's claims -- Plaintiff's claims of violation of the Michigan Consumer Protection Act (Count III) and for Breach of Duty of Good Faith (Count IV) -- are not cognizable under the law.

First, the Michigan Consumer Protection Act (the "MCPA"), is inapplicable to business transactions, as it applies only to conduct "of a business providing goods, property or services, *primarily for personal, family or household purposes.*"  M.C.L. § 445.902(d) (emphasis added); *see also Slobin v. Henry Ford Health* Care, 469 Mich. 211, 216-17, 666 N.W.2d 632 (2003) ("[T]he MCPA ... does not apply to purchases that are primarily for business purposes"), citing with approval *Zine v. Chrysler Corp*, 236 Mich. App. 261, 273, 600 N.W.2d 384 (1999) and *Jackson County Hog Producers, Inc. v. Consumers Power Co.* 234 Mich. App. 72, 84-86, 592 N.W.2d 112 (1999); *McDonald v. Thomas M. Cooley Law School*, 724 F.3d 654, 661 (6th Cir. 2013); *Batichon v. Thomas M. Cooley Law School*, 2009 WL 5214911 at *7 (E.D. Mich. Dec. 28, 2009) ("the MCPA does not apply to goods or services purchased for a business or commercial purpose.")

Here, the transaction in question was for a commercial -- not a consumer -- loan. It was not for personal, family, or household purposes, but rather, for a commercial building in which its members and others maintained business offices.  Therefore, it falls outside of the protection of the MCPA.  Therefore, Count III of Plaintiff's Complaint will

be dismissed.

Similarly, Plaintiff's Count IV, captioned as a claim for "breach of duty of good faith," is not cognizable. There is no separate cause of action under Michigan law for a breach of a "duty of good faith." *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463, 476, 666 N.W.2d 271 (2003). Therefore, Count IV of Plaintiff's Complaint will also be dismissed.

C.  PLAINTIFF HAS FAILED TO MAKE OUT A COGNIZABLE CLAIM OF DEFAMATION OR INJURIOUS FALSEHOOD

Plaintiff's Complaint contains two defamation-based claims -- "Business Defamation" (Count II) and "Injurious Falsehood" (Count V). Both of these counts are predicated on the allegation that KeyBank falsely reported to Equifax a charge-off with respect to the Wyandotte loan.

To state a claim of defamation under Michigan law, a plaintiff must show (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third-party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statements irrespective of special harm, or the existence of special harm caused by the publication. *Mitan v. Campbell*, 474 Mich. 21, 24, 706 N.W.2d 420, 421 (2005); *Rouch v. Enquirer & News of Battle Creek (after remand)*, 440 Mich. 238, 252 487 N.W. 205, 211 (1992).[6] Claims of injurious falsehood

---

[6] In the context of a "business defamation" suit, "[f]alse and malicious statements injurious to a person in his or her business are actionable *per se*, and special damages need not be alleged or proved." *Heritage Optical Ctr, Inc v.. Levine*, 137 Mich.App 793,

11

are similar and overlap with defamation, but to sustain a claim of injurious falsehood additionally requires a showing of actual malice. *New Franklin Enterprises v. Sabo*, 192 Mich. App. 219, 223,480 N.W.2d 326, 329 (1991).[7] To establish actual malice, the plaintiff must show that the defendant published the statement with knowledge that the statement was false or with reckless disregard for the truth. *Id.*

However, "[t]ruth is an absolute defense to a defamation claim." *Mitan, supra; Wilson v. Sparrow Health Sys.*, 290 Mich. App. 149, 155,700 N.W.2d 224 (2010). For the defense to apply, "it is not necessary for 'defendants to prove that a publication is literally and absolutely accurate in every minute detail.'" *Collins v. Detroit Free Press*, 245 Mich. App. 27, 33, 627 N.W.2d 5 (2001) (quoting *Roush* 440 Mich. at 258). Rather, "a defendant need only show that the statement is substantially true." *Id.* Therefore, if a publication is substantially accurate, the defendant cannot be held liable. *Hawkins v. Mercy Health Sys.*, 230 Mich. App. 315, 330, 583 N.W.2d 728 (1998); *Nichols v. Moore*, 477 F,3d 396, 399 (6th Cir. 2007) (if a statement is "substantially true, the defendant is not liable.").

---

797, 359 NW2d 210 (1984).

[7] To establish a claim of injurious falsehood, requires demonstrating that the defendant published a false statement about the plaintiff (a) intending that the publication of the statement result in harm to interests of the plaintiff having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) knowing that the statement is false or acts in reckless disregard of its truth or falsity. *Kollenberg v. Ramirez*, 127 Mich. App. 345, 352, 339 N.W.2d 176 (1983) (quoting 3 Restatement, Torts 2d § 623A).

Wyandotte's defamation and injurious falsehood claims fail because it cannot meet this threshold requirement. Plaintiff's claims are predicated upon KeyBank's reporting of a "charge-off" on Wyandotte's credit report. A "charge off" merely declares a debt as a loss to the creditor. *See* Merriam-Webster online dictionary, http://www.meriamwebster.com/dictionary/charge%20off. The charge-off noted on Wyandotte's credit report accurately reflects a financial loss incurred by KeyBank. KeyBank incurred a loss of approximately $100,000 when it sold the $300,000+ loan to Snow for $180,000. [*See* Baker Dep., Defendant's Ex. I, pp. 23-25.] Wyandotte has produced no evidence showing otherwise. Indeed, Kal Khalil acknowledged in his deposition that KeyBank sold the Wyandotte loan to Snow at less than full value and, thus, "took a hit on the loan." [*see* Kal Khalil Dep., pp. 80-81, 92].

As Wyandotte cannot show that KeyBank's report of a charge-off was false, Defendant is entitled to summary judgment on Plaintiff's defamation and injurious falsehood claims in Counts II and V.

D.  WYANDOTTE'S NEGLIGENCE AND GROSS NEGLIGENCE CLAIMS ALSO FAIL

Plaintiff asserts that Wyandotte "owed a duty to Plaintiff to accurately report credit information to national credit agencies." *See* Complaint ¶ 24. It is this "duty" that Plaintiff claims Defendant breached by "false[ly] reporting. . . a charge-off on Plaintiff's

13

credit report." *Id.* ¶ 25.[8] However, as set forth above in Section C, there was no false reporting of the charge-off. Therefore, assuming Wyandotte owed Plaintiff a duty to accurately report its credit information, that duty was not breached.

Furthermore, Wyandotte cannot show that KeyBank's reporting of the charge-off proximately caused its damages. Plaintiff has not produced evidence showing that either Charter One or Chase was committed to loaning Wyandotte the money to pay off Snow but for the charge-off notation on the credit report. Indeed, it is speculative, at best, whether Charter One or Chase would have loaned Wyandotte any money even if KeyBank had not reported a charge-off to Equifax.

As set forth above, in considering Wyandotte's loan application, Charter One asked Kal Khalil to provide it with documentation of the KeyBank-Wyandotte and Wyandotte-Snow loan agreements, but it is undisputed that Khalil did not do so. In fact, its second denial letter Charter One stated as a reason for its denial "Application has Missing Information"; it did not say that the "charge-off" was the reason for its final denial.

Chase Bank also denied Wyandotte's loan application, and stated that its denial, in part, was due to "delinquent past or present credit obligations with others." It is undisputed that in 2009, Wyandotte had defaulted on one or more loan payments to

---

[8] To make out a *prima facie* claim of negligence the plaintiff must establish a duty, and a breach of the duty proximately causing damages. *Schultz v. Consumers Power Co.*, 443 Mich. 445, 449, 506 N.W.2d 175 (1993).

14

KeyBank, and one of the principals of Wyandotte, Mohammed Abdrabboh, had also defaulted on a separate $50,000 loan from KeyBank. In light of this evidence and Chase Bank's statement that its denial was due, at least in part, to "delinquent past or present credit obligations with others," Plaintiff cannot show that the report of the charge-off proximately caused Wyandotte's inablility to obtain more favorable financing to pay off Snow.

For the foregoing reasons, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's claims of negligence and gross negligence in Counts I, IV and VI.

## IV. CONCLUSION

For all of the reasons set forth above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment **[Dkt. # 21]** is GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED, in its entirety, with prejudice.

Let Judgment be entered accordingly.


Dated: September 30, 2013          s/Gerald E. Rosen
                                   Chief Judge, United States District Court

**12-10740 Wyandotte Professional Building, LLC V. Keybank, NA
Opinion and Order Regarding Defendant's
Motion for Summary Judgment**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 30, 2013, by electronic and/or ordinary mail.

        s/Julie Owens
        Case Manager, (313) 234-5135